IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MARIA CONNOR                    )
                                )
            Plaintiff,          )
                                )
v.                              )          Case No. 1:07-CV-0650-RLV
                                )
SUNTRUST BANK                   )
                                )
            Defendant.          )
                                )

## DEFENDANT SUNTRUST BANK'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SANCTIONS

## I.   INTRODUCTION

In a spirited effort to draw blood from a turnip, Plaintiff has filed a motion to sanction SunTrust for destroying a document that is already in the record in this case.  Plaintiff's motion should be denied because the undisputed evidence establishes that no relevant documents have been lost.  Plaintiff's motion should also be denied because, when SunTrust received notice of Plaintiff's potential claims, the Company took reasonable steps to preserve and retain relevant documents.  Accordingly, for the reasons set forth more fully below, SunTrust respectfully requests that Plaintiff's motion be denied in its entirety.

## II.   STATEMENT OF FACTS

### A.   Plaintiff's Employment With SunTrust.

Plaintiff was employed by SunTrust as the Communications and Engagement Manager in the Business Performance Group ("BPG") of the Company's Enterprise Information Services ("EIS") division from June 2006 until her position was eliminated effective March 31, 2007.  (Pl. Dep. at 105, 249.)[1] Plaintiff contends that SunTrust improperly changed her job while she was on FMLA leave and then eliminated it for the same reason. As will be demonstrated in

---

[1]  As Plaintiff has done with the deposition transcripts of SunTrust witnesses, SunTrust will submit Plaintiff's deposition transcript for consideration with this brief.  The Declarations of Brian Edwards, Sue Johnson, and Leslie Weigel are attached hereto as Exhibits 1, 2, and 3, respectively.

SunTrust's summary judgment brief that will be filed with the Court within the next two weeks, any changes that occurred to Plaintiff's job while she was on FMLA leave were wholly unrelated to such leave.  Similarly, Plaintiff's job was abolished for reasons wholly independent of her FMLA leave.  While SunTrust will not argue its motion for summary judgment here, the following undisputed facts set forth below are important to the Court's analysis of the instant motion as they relate to the timing of the decisions at issue and, in turn, the timing of the preparation and/or dissemination of documents relating to such decisions.

From June 2006 until early November 2006, one of Plaintiff's primary job duties was to manage communications for Project 2010, an ongoing joint venture between SunTrust and IBM.  (Pl. Dep. at 59.)  During this time period, Plaintiff's manager, Leslie Weigel, received several complaints regarding her behavior and effectiveness in her Project 2010 role.  (Weigel Dep. at 133-36, 149-50, 153-54; Pl. Dep. at 159-60.)  Plaintiff was counseled about some of these issues during the summer and early fall of 2006.  (Pl. Dep. at 116, 122-23.)  When Plaintiff's performance did not improve, Ms. Weigel learned that the leaders of Project 2010 requested that Plaintiff be removed from the Project.  (Weigel Dep. at 162-64; 182-84 & Exh. 21.)  Ms. Weigel decided to honor their wishes.  (*See id.*)

In mid-October 2006, Plaintiff informed Ms. Weigel that she planned to adopt a child who was due to be born in early to mid-December 2006.  (Pl. Dep. at 158, 161.)  To Plaintiff's surprise, the baby was born on November 6, at which time she requested and was granted leave from SunTrust pursuant to the Family and Medical Leave Act ("FMLA").  (*Id.* at 62, 158-60.)

One of Plaintiff's job responsibilities at the time she left for FMLA leave was to oversee SunTrust's three-person Enterprise Publication Services ("EPS") group.  (*Id.* at 51, 68-69.)  The EPS group was located in Orlando, Florida and consisted of one supervisor, Rob Swanson, and two employees who reported directly to him. (*Id.* at 61, 69, 105; Weigel Dep. at 74.)  While Plaintiff was on FMLA leave, Mr. Swanson resigned from SunTrust, to Plaintiff's surprise.  (Pl. Dep. at 222-23.)  As a result of Mr. Swanson's resignation, Ms. Weigel and her colleague in charge of SunTrust's Banking Services department decided to transfer what remained of the EPS group to Banking Services.  (Weigel Dep. at 254-59.)  After this transfer occurred in December 2005, Plaintiff no longer had any responsibility for managing what remained of the EPS group.  (*Id.* at 257-58.)  The transfer of the EPS group was permanent (*Id.* at 256) and entirely unrelated to Plaintiff's FMLA leave.

LEGAL02/30597629v3

In part due to these changes to Plaintiff's job and for other reasons also

unrelated to Plaintiff's FMLA leave, Ms. Weigel made the decision to eliminate

Plaintiff's job at SunTrust in mid-January 2007.  (*See id.* at 249-51.)  Ms. Weigel

informed Plaintiff of this decision on January 30, 2007.  (Pl. Dep. at 245.)  Plaintiff

continued to work at SunTrust after that date and was paid through March 31,

2007.  (*Id.* at 249.)

B.     SunTrust Documents Relating to Plaintiff's Termination.

Prior to making the decision to eliminate Ms. Connor's position, Ms. Weigel

had conversations with Tish Drury, the member of SunTrust's Human Resources

staff responsible for employee relations in the BPG group, and Tim Sullivan, Ms.

Weigel's manager and SunTrust's Chief Information Officer.  (Weigel Dep. at

228.)  Ms. Weigel did not use email to communicate about the decision prior to

making it.  (Weigel Dep. at 229.)  After she made the decision, she prepared the

necessary paperwork and emailed it to Ms. Drury on January 12, 2007 for

processing.[2]  (Weigel Dep. at 276-77; Weigel Decl. at ¶ 3.)  Ms. Weigel spoke to

Ms. Drury about the elimination of Ms. Connor's position after she sent the

---

[2]  Ms. Weigel's January 12, 2007 email to Ms. Drury were produced by SunTrust
in response to Plaintiff's First Request for Production of Documents on July 30,
2007.

January 12, 2007 email; however, they did not have any further email

communication on this issue. [3]  (Weigel Dep. at 277; Weigel Decl. at ¶¶ 3, 5.)

After she decided to eliminate Ms. Connor's position, Ms. Weigel informed

the senior management team of EIS about her decision during one of this group's

regular weekly meetings with Mr. Sullivan.  (*See* Weigel. Decl. ¶ 4.)  At one such

meeting that occurred after Ms. Weigel told Ms. Connor about the position

elimination, members of the group asked Ms. Weigel whether they could tell their

respective teams that Ms. Connor's job had been eliminated.  (*Id.*)  Ms. Weigel

told them that she and Ms. Connor had not yet met with their own teams to share

that information so it should be kept confidential until they had a chance to do so.[4]

(*Id.*)  Ms. Connor and Ms. Weigel met with the members of their respective teams

---

[3]  Consistent with the procedures in place for job eliminations at SunTrust, Ms. Drury emailed the paperwork to Fred Boyd, the Employee Relations Consultant assigned to Plaintiff's group, and then spoke with Mr. Boyd about it.  (Drury Dep. at 157-58; 168-69 & Exh. 4.)  Ms. Drury's email exchange with Mr. Boyd regarding this job elimination was produced to Plaintiff on July 17, 2007.

[4]  Aware of the sensitive nature of a job elimination, Ms. Weigel wanted to give Ms. Connor time to process the information before it became public knowledge. Instead of making an immediate announcement upon informing Ms. Connor on January 30, Ms. Weigel told Ms. Connor that she would give her some time and they would reconvene to lay out a joint plan to communicate the information to their teams.  (Weigel Dep. at 269.)  Ms. Weigel and Ms. Connor met to develop this plan approximately one week later.  (*Id.* at 270.)  Ms. Connor decided that each would inform her own direct reports during separate group meetings.  (*Id.* at 270-71.)  Ms. Weigel and Ms. Connor took steps to schedule these team meetings which were ultimately held on February 12, 2007.  (*Id.*)

on February 12, 2007.  (Weigel Dep. at 271-72.)  After the meetings concluded,

Ms. Weigel emailed her peers to tell them that she and Ms. Connor had informed

their teams that Ms. Connor's job had been abolished.[5]  (Weigel Decl. ¶ 4.)  Ms.

Weigel did not receive any responses to her February 12, 2007 email.  (*Id.*)

    C.    <u>Plaintiff's Notice to SunTrust of Alleged FMLA Claims and Steps</u>
         <u>Taken by SunTrust to Preserve Documents and Information</u>.

On or about February 21, 2007, SunTrust received a letter from attorney

Benjamin Stone, Plaintiff's counsel in the instant case.  (Edwards Decl. ¶ 3.)  The

letter was routed to Brian Edwards, SunTrust's Senior Vice President and Deputy

General Counsel for Regulatory Affairs.  (*Id.*)  When he received the letter, Mr.

Edwards reviewed it and initiated an investigation of Plaintiff's allegations.  (*Id.*)

Within a day, Mr. Edwards began to identify the SunTrust employees who were

likely to possess information and documents related to Plaintiff's potential claims.

(*Id.* at ¶¶ 3-4.)  He spoke with Tish Drury on February 22, 2007 and began to

---

[5]  Plaintiff dramatically contends that Ms. Weigel's February 12 email is a "contemporaneous written statement by a decision-maker" and "direct evidence of the illegal reason for SunTrust's termination of [Plaintiff's] employment."  (Pl. Brief. at 18, n5.)  In fact, the email is neither of these things.  To the contrary, the email was written by Ms. Weigel one month after she decided to eliminate Plaintiff's job and makes no mention whatsoever of Plaintiff's FMLA leave. Moreover, all of the "changes to the make-up of [Plaintiff's] team" that are referenced in the email were changes that occurred for reasons totally unrelated to Plaintiff's FMLA leave.  Likewise, as will be shown in SunTrust's motion for summary judgment, the decision to eliminate Plaintiff's job was wholly independent of Plaintiff having taken FMLA leave from SunTrust.

obtain factual information about the allegations in Mr. Stone's letter.  (*Id.* at ¶ 4.)

Based on his conversation with Ms. Drury and his review of the letter, he

determined that the SunTrust employees who were directly involved in the

decisions that appeared to be at issue were Ms. Drury, Ms. Weigel, Bill Franklin,

and Sue Johnson, Ms. Drury's manager.  (*Id.*)  Mr. Edwards instructed Ms. Drury

to preserve all documents in her possession relating to Plaintiff's allegations,

including electronic documents such as email.  (*Id.*)  Moreover, because Ms. Drury

worked closely with, and in close proximity to, Ms. Johnson and Ms. Weigel and

because Mr. Edwards was unable to meet immediately with Ms. Johnson and Ms.

Weigel, Mr. Edwards asked that Ms. Drury convey this preservation instruction to

them as well.  (*Id.*)

Mr. Edwards then scheduled a meeting with Ms. Drury and Ms. Weigel for

March 5, 2007, the first date that all three were available.  (*Id.*)  Prior to this

meeting, Mr. Edwards received documents relating to Plaintiff's allegations from

Ms. Drury, Ms. Weigel and Ms. Johnson.  (*Id.* at ¶ 5; *see also* Johnson Decl. ¶ 11.)

During this meeting, Mr. Edwards reiterated to Ms. Drury and Ms. Weigel the

importance of making sure that all documents regarding Plaintiff were preserved.

(Edwards Decl. ¶ 6.)

At the March 5 meeting, Mr. Edwards sought to identify additional persons who may have information or documents relating to Plaintiff's allegations. Ms. Drury and Ms. Weigel identified several current and former SunTrust employees as well as a few non-SunTrust, IBM employees as such persons. (*Id.* at ¶ 7.) Beginning the following day and continuing over the next several weeks, Mr. Edwards interviewed each SunTrust employee who had been identified to him as a person who may have documents or knowledge relating to the topics addressed in Mr. Stone's letter. (*Id.* at ¶ 8.) During each of his interviews, Mr. Edwards explained to the interviewee the nature and scope of SunTrust's document preservation obligations and asked them to take appropriate steps to locate and preserve all potentially relevant documents.[6] (*Id.* at ¶ 8.)

During his March 5 conversation with Ms. Drury and Ms. Weigel, Mr. Edwards inquired as to whether Mr. Sullivan was involved in any of the decisions about which Ms. Connor complained. (*Id.* at ¶ 5.) Ms. Weigel and Ms. Drury told Mr. Edwards that Mr. Sullivan did not have any role in making such decisions but

---

[6] Mr. Edwards spoke with Mr. Franklin on March 6, by which time Mr. Franklin had retired from SunTrust. (Edwards Decl. ¶ 7.) Mr. Franklin identified all of the documents about which he was aware that might have been relevant to Ms. Connor's claims and directed Mr. Edwards to all such documents. (*Id.*)

- 8 -

had been told about Ms. Weigel's decision to eliminate Plaintiff's job.[7]  (*Id.*)  This

information was entirely consistent with Mr. Edwards' experience at SunTrust.

(*Id.*)  As such, he had no reason to believe that Mr. Sullivan had documents in his

possession relating to Plaintiff and therefore, he did not contact Mr. Sullivan

regarding Plaintiff's potential claims at that time.  (*Id.*)

Similarly, with the exception of Ms. Johnson, Mr. Edwards did not contact

any of Ms. Weigel's peers (the other SunTrust managers who reported to Mr.

Sullivan) in the EIS department regarding Plaintiff's allegations because he had no

reason to believe that any such persons had any involvement in the decisions

referenced in Mr. Stone's letter or had any documents in their possession relating

to Ms. Connor's employment.[8]  (*Id.* at ¶ 9.)

---

[7]  Plaintiff's characterization of Mr. Sullivan as an "important witness" (Pl. Brief at
14) is entirely inconsistent with the evidence of record.  While Plaintiff goes to
great lengths to suggest that SunTrust represented in its interrogatory responses
that Mr. Sullivan had an active role in the decision to eliminate Plaintiff's job, in
fact, SunTrust's response simply states that Ms. Weigel "sought support for her
decision" from Mr. Sullivan. (SunTrust's Response to Plaintiff's Interrogatory No.
3, Pl. Brief at Exhibit B, p. 5.)  Similarly, Ms. Weigel testified that she informed
Mr. Sullivan about her intention to eliminate Ms. Connor's position before she
submitted the necessary paperwork to Ms. Drury.  (Weigel Dep. at 228.)  The
Court should reject Plaintiff's effort to twist SunTrust's words.

[8]  Months later, during the course of discovery in this litigation, Mr. Edwards was
made aware of Ms. Weigel's February 12 email to the "DL.EIS.Sullivan.Directs"
about the fact that her team and Ms. Connor's team were told about the decision to
eliminate Ms. Connor's position. (Edwards Decl. ¶ 9.)  This was the first and only

D.    Steps Taken By Ms. Johnson and Ms. Weigel to Carry Out The
      Instruction to Preserve Relevant Email.

    1.    Ms. Johnson.

Shortly after she was instructed to preserve all documents in her possession

relating to Plaintiff's allegations, Ms. Johnson undertook a search for all such

paper and electronic documents in her possession.[9]  (Johnson Decl. ¶ 11.)  During

this search, Ms. Johnson searched her entire Outlook profile (including her inbox,

sent items folder, and deleted items folder) and her computer hard drive and did

not find Ms. Weigel's February 12 email.  (*Id.*)  While Ms. Johnson does not recall

specifically when, prior to March 5, she deleted this email, it is likely that she

deleted it as soon as she received it.  (*Id.* at ¶¶ 5-6, 10.)  The email required no

action on her part, and, in fact, she was already aware of the information contained

in the email when she received it.  (*Id.* at ¶ 8.)  Because SunTrust restricts the size

of the email file that employees are permitted to maintain, Ms. Johnson strives to

keep her email file small and, to that end, she typically deletes all incoming email

messages that do not require her follow-up.  (*Id.* at ¶¶ 5-6.)  Similarly, Ms. Johnson

also regularly deletes email from her sent items and deleted items folders.  (*Id.* at ¶

indication that SunTrust has received that any of these individuals were ever in
possession of even a single document relating to this decision.  (*See id.*)
[9]  While Ms. Johnson is not aware of the precise date when she performed these
searches, she knows that they were completed prior to March 5, 2007.  (Johnson
Decl. ¶ 11.)

6.)  This practice is entirely consistent with that of many other SunTrust

employees.  (Edwards Decl. ¶ 11; *see also* Weigel Dep. at 26.)

      2.    <u>Ms. Weigel</u>.

     Ms. Weigel employs a general practice of archiving email messages from

her inbox and sent mail folders approximately every week.  (Weigel Dep. at 25-

27.)  She does not archive every sent and received message, but will delete some

email from her inbox upon receipt and will delete some email from her sent mail

folder on a random basis.  (*Id.* at 25-26.)

     After Plaintiff raised allegations concerning changes to her job and the

elimination of her job, Ms. Weigel searched her email archives at various times for

relevant documents and provided such email to SunTrust's counsel.  (*Id*. at 20-28.)

When Plaintiff produced a copy of Ms. Weigel's February 12 email, Ms. Weigel

looked in her email archive to determine whether she also had a copy of this

message that she had somehow overlooked when gathering relevant documents.

At that time, Ms. Weigel realized that she had a gap in her sent email archive for

the period of January 1 through February 18, 2007.  (*Id.* at 274-75.)

     The only explanation for this gap was that Ms. Weigel had not followed her

usual practice of archiving all of her sent email for this period of time.  At times

when Ms. Weigel is busy, she may fall behind in her archiving routine.  (*Id.* at 26-

27.)  If Ms. Weigel is unable to archive her email folders in a timely manner,

emails that are more than 30 days old will be deleted from her Outlook profile by

routine operation of SunTrust's email system.  (Edwards Decl. ¶ 10; Weigel Dep.

at 275.)

       E.    <u>SunTrust's Response to Plaintiff's Allegations of Spoliation</u>.

When SunTrust received Plaintiff's September 10, 2007 letter in which she

alleged that SunTrust intentionally destroyed documents relevant to her claims,

SunTrust extensively investigated Plaintiff's allegations.  Consistent with the facts

set forth above, SunTrust found no evidence whatsoever to establish conclusively

that any relevant document existed at the time the Company received Plaintiff's

demand letter but was subsequently destroyed.  The only email message that might

have been deleted after SunTrust received Mr. Stone's February 21, 2007 letter

was Ms. Weigel's copy of her own February 12 email.  While it is possible that

this email could have remained in Ms. Weigel's current Outlook profile for 30-

days after it was sent, it is also possible that it was entirely eliminated from

SunTrust's server before the Company was ever aware of Plaintiff's potential

claims.  Because SunTrust has no way to track when a particular email is deleted

from its server (Edwards Decl. ¶ 11), the Company could not determine whether

this message was deleted before or after February 21.  Significantly, however,

SunTrust found no evidence whatsoever of any email messages relating to Plaintiff's termination other than the messages that were produced in discovery in this case.[10] Similarly, SunTrust found no evidence of any "lost" messages relating to Plaintiff's FMLA leave from SunTrust or relating to any other decisions about which Plaintiff complained.

SunTrust was not able to provide some of the information sought by Plaintiff in her communications. For instance, as stated above, SunTrust has no means of tracking when a particular email message was deleted from an email server. (*Id.*) Similarly, SunTrust has no means of tracking when a particular email message was deleted from an employee's archived email file. (*Id.* at ¶ 12.) Moreover, none of the backup tapes in SunTrust's possession when Plaintiff raised her allegations of

---

[10] This was not surprising given the undisputed evidence set forth above. Moreover, by the time SunTrust received Mr. Stone's letter, more than 40 days had passed since the decision to eliminate Plaintiff's position was made. Simple logic dictates that the email communication Plaintiff imagines would have preceded this decision and therefore would have been eliminated from SunTrust's electronic systems some time before Plaintiff notified SunTrust of her potential claims. The other decisions about which Plaintiff complains (such as the transfer of the EPS group and her removal from Project 2010 described in Section II(A) above) occurred in 2006 and documents pertaining to such decisions would have been eliminated even earlier.

spoliation would have contained any email from January or February 2007.[11]  (*Id.* at ¶ 13.)

SunTrust informed Plaintiff of its position and attempted to explain many of the undisputed facts to Plaintiff.  (*See* Pl. Brief at Exhs. E and G.)  Plaintiff rejected every legitimate explanation offered by SunTrust as "illogical" and "inconsistent" and offered her own incredible theories for what had or had not occurred.  It quickly became clear from the tone of Plaintiff's communications regarding this issue that Plaintiff was not going to accept or believe any reason the Company offered for why it did not produce Ms. Weigel's email in discovery.

## III.   ARGUMENT AND CITATION OF AUTHORITY

The factual record in this case does not support an imposition of sanctions against SunTrust for spoliation of documents.  Although a court has the inherent

---

[11]  SunTrust backs up its email servers onto backup tapes for disaster recovery purposes on a daily basis.  (Edwards Decl. ¶ 13.)  These backup tapes are retained for approximately seven to ten days before being overwritten.  (Edwards Decl. ¶ 13.)  As a result, at any given time they contain email that is anywhere from seven days old on the low end to 37 to 40 days old on the high end, a variation is attributable to the age of the email message when it is deleted from an employee's current Outlook profile.  (Edwards Decl. ¶ 13.)  For example, an email that was retained for 30 days before being deleted from a current Outlook profile will survive on the email server for 37 to 40 days.  (*Id.*)  An email that was retained for only one day before being deleted from a current Outlook profile will survive on the email server for only seven to ten days.  (*Id.*)  The net effect of this system is that, unless an email is archived outside of Outlook, then it will exist at SunTrust for no more than 37 to 40 days at the most.  (*Id.*)

LEGAL02/30597629v3

authority to impose sanctions, including an adverse inference jury instruction, for a party's spoliation of relevant information, that authority should be exercised cautiously and only in extraordinary circumstances. *Chambers v. NASCO*, 501 U.S. 32, 45-46 (1991) (holding that the court's inherent power to impose sanctions should be exercised with restraint and only in narrowly defined circumstances, such as where "a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons . . . ."); *see also Byrne v. Nezhat*, 261 F.3d 1075, 1106 (11th Cir. 2001) ("A court should be cautious in exerting its inherent power . . . Because the court's inherent power is so potent, it should be exercised with restraint and discretion.")(internal citations omitted).  Moreover, the party requesting the sanction bears the burden of demonstrating such extraordinary circumstances. *Scott v. IBM Corp.*, 196 F.R.D. 233, 248 (D.N.J. 2000).  This burden is particularly heavy where, as here, a party seeks the extreme sanction of an adverse inference jury instruction:

> An adverse inference instruction is a powerful tool in a jury trial. When giving such an instruction, a federal judge brands one party as a bad actor, guilty of destroying evidence that it should have retained for use by the jury.  It necessarily opens the door to a certain degree of speculation by the jury, which is admonished that it may infer the presence of damaging information in the unknown contents of [the spoliated evidence].

*Morris v. Union Pac. R.R.*, 373 F.3d 896, 900-01 (8th Cir. 2004); *see also*

*Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003) ("[T]he

adverse inference instruction is an extreme sanction and should not be given

lightly."); *Thompson v. U.S. Dep't of Hous. & Urban Dev.*, 219 F.R.D. 93, 100-01

(D. Md. 2003) ("In practice, an adverse inference instruction often ends the

litigation – it is too difficult a hurdle for the spoliator to overcome.").

Plaintiff cannot sustain her burden of proving that any sanction is warranted

against SunTrust, much less the draconian sanction of an adverse inference jury

instruction.  As discussed below, Plaintiff's motion should be denied because, *inter

alia*, (1) Plaintiff has not established that any spoliation occurred; (2) there is no

evidence that any relevant emails have been lost (and indeed, the undisputed

evidence establishes that all relevant emails have been produced in this case); (3)

Plaintiff has not suffered any prejudice; and (4) there is no evidence that SunTrust

has acted in bad faith.

      1.    <u>There is no evidence that any spoliation occurred</u>.

Spoliation is defined as "the destruction or significant alteration of evidence,

or the failure to preserve property for another's use as evidence in pending or

reasonably foreseeable litigation."  *Griffin v. GMAC Commercial Finance, LLC*,

No. 1:05-cv-199, 2007 WL 521907, at *3 (N.D. Ga. Feb. 15, 2007).  The necessary

first step in assessing a claim of spoliation is to determine whether a duty to

preserve the evidence at issue existed at the time of its destruction.[12]  *See id.*

Plaintiff has not established conclusively that any spoliation occurred in this case.

Plaintiff's entire motion is premised on the assumption that both Ms. Johnson and

Ms. Weigel necessarily had possession of Ms. Weigel's February 12 email at the

time that each received instructions from SunTrust's counsel to preserve all

documents pertaining to Plaintiff's allegations.  As set forth in Section II(D)

however, this premise is flawed.  The undisputed evidence establishes that the

February 12 email was not in Ms. Johnson's Outlook profile when she searched for

all documents and emails relating to Plaintiff sometime between when she learned

of Plaintiff's allegations on February 22 and March 5.  (Johnson Decl. ¶ 11.)  This

was entirely consistent with Ms. Johnson's usual practices for email retention.  (*Id.*

at ¶¶ 5-6.)  While it is possible that the message was in Ms. Weigel's Outlook

profile after she learned of Plaintiff's allegations, it is also possible that Ms.

Weigel had already deleted it.

---

[12]  Such an analysis is straightforward in a product liability action, such as *Flury v. Daimler Chrysler Corp*, 427 F.3d 939 (11th Cir. 2005), and other cases upon which Plaintiff relies.  In *Flury*, the plaintiff sued the defendant for personal injuries he allegedly suffered as a result of a manufacturing defect in his car's airbag system.  The defendant responded by requesting to inspect the vehicle. Plaintiff never responded to defendant's request and eventually permitted the car to be sold for salvage.  There was no question that the car existed when the plaintiff was allegedly injured but that he caused it to be destroyed.

- 17 -

2.      <u>There is no evidence that any relevant emails have been lost</u>.

Even if the Court finds that Ms. Weigel's February 12, 2007 email existed at

SunTrust when the Company had a duty to preserve it, sanctions are not warranted

because there is no evidence that any relevant emails have been lost.  Instead, as

set forth below, the undisputed evidence establishes that no other emails were lost.

To support a request for an adverse inference instruction, the moving party

has the burden of establishing that the alleged spoliated documents were both

relevant to the claims or defenses in the case and would have been favorable to its

case.  *Zubulake*, 220 F.R.D. at 221 ("In order to receive an adverse inference

instruction, [Plaintiff] must demonstrate not only that [Defendant] destroyed

relevant evidence as that term is ordinarily understood, but also that the destroyed

evidence would have been favorable to her.")  "The party seeking the sanction of

an adverse inference 'must adduce sufficient evidence from which a reasonable

trier of fact could infer that the destroyed or unavailable evidence would have been

of the nature alleged by the party affected by its destruction . . . Thus, before an

adverse inference may be drawn, there must be some showing that there is in fact a

nexus between the proposed inference and the information contained in the lost

evidence."  *Consolidated Aluminum Corp. v. Alcoa, Inc.*, Civil Action No. 03-

1055-C-M2, 2006 WL 2583308, at *11 (citing *Residential Funding Corp. v.*

*Degeorge Fin. Corp.*, 306 F.3d 99 (2nd Cir. 2002)) (internal quotations omitted). "In other words, *some extrinsic evidence of the content of the emails is necessary* for the trier of fact to be able to determine in what respect and to what extent the emails would have been detrimental." *Id.* (emphasis supplied). This burden cannot be met through speculation and conjecture, but must be satisfied through the introduction of probative evidence. *See Gates Rubber Co. v. Bando Chem. Indus.*, 167 F.R.D. 90, 104-05 (D. Colo. 1996) (holding that a party seeking an adverse inference instruction must introduce "substantial circumstantial evidence" showing that spoliated documents would have produced evidence favorable to that party); *Holt v. The Northwestern Mut. Life Ins. Co.*, No. 1:04-cv-280, 2005 WL 3262420, at *4 (W.D. Mich. Nov. 30, 2005) (denying sanctions for alleged destruction of email where moving party failed to establish that contents of allegedly spoliated emails would be favorable to him).

Plaintiff fails to proffer any evidence to suggest that any additional emails ever existed that were relevant to her claims or would have been detrimental to SunTrust. Instead, Plaintiff simply argues, in wholly conclusory fashion, that because Ms. Weigel sent one email relating to her decision to eliminate Plaintiff's job, then she and others at SunTrust must have sent other emails on this topic that have been lost. Plaintiff's argument is without merit because the undisputed

evidence establishes that *no such email ever existed at SunTrust*.  Indeed, it is undisputed that Ms. Weigel sent precisely *two* emails relating to Ms. Connor's position elimination:  one email to Tish Drury on January 12, 2007 and one email to her peer group on February 12, 2007.  (Weigel Decl. ¶¶ 3-5.)  No amount of wishful speculation by Plaintiff will change this undisputed fact, particularly in light of the undisputed evidence that it is not Ms. Weigel's practice to use email to communicate about sensitive employment-related issues such as employee terminations.  (*Id.* at ¶ 4.)

Likewise, it is undisputed that Ms. Weigel did not receive email responses to either of the emails that she sent.  (*Id.* at ¶¶ 3-5; Johnson Decl. ¶ 8.)  Moreover, there is no evidence that any other SunTrust employee sent any email relating to Plaintiff's job elimination.  In sum, Plaintiff's rank speculation, the only foundation upon which Plaintiff's suggestion of lost email rests, is an insufficient basis upon which to award any sanction, let alone the drastic sanction of an adverse inference instruction.  *See Escobar v. City of Houston*, No. 04-1945, 2007 WL 2900581, at *17-19 (S.D. Tex. Sep. 29, 2007) (refusing to order adverse inference instruction based on city's failure to preserve email communication from days following police shooting that formed basis of litigation where plaintiff offered

- 20 -

only speculation that there was any email from these days to suggest that any relevant email had been lost).

        3.    <u>Plaintiff has not been prejudiced in any way</u>.

Even if Plaintiff could establish that Ms. Weigel's February 12 email was spoliated by SunTrust, her motion for sanctions should still be denied because Plaintiff has not suffered any prejudice.  Plaintiff has had this document since February 2007, before she filed the instant lawsuit.  (Pl. Dep. at 254.)  Therefore, even if SunTrust failed to preserve this document after the company was on notice of potential litigation, such failure had no impact whatsoever on Plaintiff.  *Griffin,* 2007 WL 521907, at * 4 (denying request for an adverse inference instruction despite fact that employer failed to preserve documents relating to plaintiff and noting that plaintiff obtained the documents from his own sources so the employer's negligence had "little practical impact").

Plaintiff further contends that she has been prejudiced by SunTrust's failure to produce the Weigel email, despite the fact that she has had a printed copy of the email since approximately one week after it was sent (Pl. Dep. at 254), because she has no electronic information about the email.  (<u>See</u> Pl. Brief at 15.)  Plaintiff's argument in this regard is a red herring because Plaintiff never requested that such electronic information relating to any email in this matter be produced to her.

- 21 -

The Federal Rules of Civil Procedure set forth specific procedures relating to the discovery of electronically stored information (ESI) such as email.  The Rules provide that "[a] party may serve on any other party a request (1) to produce . . . any designated documents or [ESI] . . . .").  Fed. R. Civ. P. 34(a).  The Rules further permit the requesting party to specify in their requests "the form or forms in which [ESI] is to be produced."  Fed. R. Civ. P. 34(b).  If the requesting party does not specify the requested form for production of ESI in the written document request, the responding party "must state the form that it intends to use."  *Id.*  In this circumstance, the responding party may produce the ESI either in the form in which it is ordinarily maintained or in any form that is reasonably usable.  Fed. R. Civ. P. 34(b)(ii).

Plaintiff failed to indicate any form for production of ESI in her First Request for Production of Documents.[13]  Therefore, SunTrust chose to produce ESI in printed form, a form that is reasonably usable for purposes of litigation. Pursuant to the requirements of Rule 34(b), SunTrust's response to Plaintiff's request clearly stated that SunTrust planned to produce ESI in printed form. Specifically, SunTrust stated as follows:  "Unless otherwise noted in SunTrust's

---

[13]  A copy of Plaintiff's First Interrogatories and First Request for Production of Documents is attached hereto as Exhibit 4.

responses below, SunTrust will produce non-privileged electronically stored information that is responsive to the instant interrogatories in printed form." (Pl. Brief, Exhibit B at p. 2.)  Consistent with this response, SunTrust produced more than 400 printed pages of email.  Plaintiff never objected to the form of production selected by SunTrust or moved to compel production of any email in an alternate format.  Plaintiff has not been prejudiced by her failure to receive data in a form that she never sought.  Moreover, Plaintiff has not suffered any prejudice because she had ample opportunity to question Ms. Weigel about the email at her deposition and could have sought to depose the recipients of the email about the message at any point during discovery in this case.  In short, Plaintiff has not suffered any prejudice here.

4.    There is no evidence of bad faith on the part of SunTrust.

Plaintiff's motion should be denied for the additional reason that she cannot demonstrate that the alleged spoliation was the result of bad faith on the part of SunTrust.  Under controlling law, an adverse inference may only be drawn from a party's failure to preserve evidence when the absence of the evidence is predicated on bad faith. *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997) ("Mere negligence in losing or destroying the records is not enough for an adverse inference, as it does not sustain an inference of consciousness of a weak case.")

- 23 -

(internal citations omitted). A court should not infer that the missing evidence is unfavorable to the alleged spoliator unless the circumstances surrounding the absence of the evidence indicate that the party tampered with the evidence. *Id.*

Plaintiff has offered no evidence of bad faith on the part of SunTrust and cannot do so on this record. As set forth in Section II(C) above, upon receipt of Plaintiff's demand letter, SunTrust took immediate steps to identify all of the SunTrust employees who were likely to have discoverable information and documents relating to Plaintiff's potential claims and instructed such persons to preserve all such documents, including email communications.[14] (*See* Edwards Decl. ¶¶ 3-9.) Moreover, the only potential SunTrust employee who may have lost a single relevant document after receiving such an instruction is Ms. Weigel, and even if she did lose the email by failing to archive it after that time, there is no evidence that this failure was anything other than an inadvertent oversight.

Throughout her Brief, Plaintiff equates SunTrust's decision not to address every farfetched allegation and conspiracy theory that she conjured with bad faith

---

[14] SunTrust's duty to preserve documents following notice of Plaintiff's potential claims extended only to those employees "likely to have relevant information, i.e. the 'key players' in the litigation." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003). Thus, other than Ms. Johnson, the recipients of Ms. Weigel's February 12 email were outside of the scope of SunTrust's document preservation obligation because SunTrust had no reason to believe that any of these persons were likely to have relevant information or documents. (*See* Edwards Decl. ¶¶ 5, 9.)

on the part of the Company.  Of course, Plaintiff cannot establish bad faith by requiring SunTrust to chase every stone that she throws.  Plaintiff also charges that SunTrust improperly changed its story in communications with Plaintiff regarding her spoliation allegations.  For example, Plaintiff alleges that SunTrust initially represented that Mr. Sullivan was instructed to preserve documents but later stated that he was not so instructed.  As explained above in footnote 7, Plaintiff's accusation is based on her own tortured interpretation of SunTrust's words and cannot withstand scrutiny.  Finally, Plaintiff urges that SunTrust has demonstrated bad faith by failing to grant Plaintiff the "remedies" she proposed.  However, Plaintiff's proposed "remedies" are both unnecessary and impossible.  They are unnecessary because of the undisputed fact that no documents have been lost in this case.  They are impossible because, as explained in Section II(E) above, due to the nature of SunTrust's systems for storage and retention of email, SunTrust has no means to recover these speculative emails or other documents.  (*See* Edwards Decl. ¶¶ 11-13.)  There simply is no evidence of bad faith on the part of SunTrust.

## IV.   CONCLUSION

For the foregoing reasons, SunTrust respectfully requests that the Court deny Plaintiff's Motion for Sanctions in its entirety.

LEGAL02/30597629v3

Respectfully submitted this 23rd day of November, 2007.

ALSTON & BIRD, LLP[15]

By:   s/Alicia P. Starkman
      R. Steve Ensor
      Georgia Bar No. 249360
      steve.ensor@alston.com
      Alicia P. Starkman
      Georgia Bar No. 676475
      alicia.starkman@alston.com
      1201 West Peachtree Street
      Atlanta, Georgia 30309-3424
      Tel:  (404) 881-7000
      Fax:  (404) 881-7777

      ATTORNEYS FOR SUNTRUST BANK

---

[15]  Pursuant to LR 7.1D, NDGa counsel for SunTrust certifies that this brief is prepared with one of the font and point selections approved by the court in LR 5.1B, NDGa.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MARIA CONNOR                          )
                                      )
            Plaintiff,                )
                                      )
v.                                    )        Case No. 1:07-CV-0650-RLV
                                      )
SUNTRUST BANKS                        )
                                      )
            Defendant.                )
_____       )

### CERTIFICATE OF SERVICE

I hereby certify that on this date I electronically filed the DEFENDANT SUNTRUST BANK'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SANCTIONS with the Clerk of Court using the CM-ECF system which will automatically send email notification of such filing to the following attorneys of record:  Ben Stone, Thomas Munger.

This 23rd day of November, 2007.

                                s/Alicia P. Starkman
                                Alicia P. Starkman
                                alicia.starkman@alston.com